United States District Court<br>Northern District of California

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6 EUREKA DIVISION

7

8 ANDRALYNN LONG,                                    Case No.  19-cv-02669-RMI

9                      Plaintiff,

10            v.                                      **ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

11 NANCY A. BERRYHILL,                                Re: Dkt. Nos. 21, 22

12                      Defendant.

13

14            Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her

15 application for disability insurance benefits and supplemental security income under Titles II and

16 XVI of the Social Security Act. On June 16, 2015, Plaintiff filed her application for benefits

17 alleging an onset date of May 1, 2015. *See* Administrative Record ("*AR*") at 120.[1] The ALJ denied

18 the application on May 18, 2018. *Id.* at 128. Plaintiff's request for review of the ALJ's

19 unfavorable decision was denied by the Appeals Council on March 28, 2019 (*id*. at 1-7), and thus,

20 the ALJ's decision became the "final decision" of the Commissioner of Social Security which this

21 court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the

22 jurisdiction of a magistrate judge (dkts. 8 & 12), and both parties have moved for summary

23 judgment (dkts. 21 & 22). For the reasons stated below, the court will grant Plaintiff's motion for

24 summary judgment, and will deny Defendant's motion for summary judgment.

25                              **LEGAL STANDARDS**

26            The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

27 _____

28 [1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #18. *See* (dkts. 18-1 through 18-71).

United States District Court
Northern District of California

conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## SUMMARY OF THE RELEVANT EVIDENCE

At the time the hearing, Plaintiff was nearly 50 years of age and previously had a career as clerical worker that involved significant word processing and data entry. *See* Pl.'s Mot. (dkt. 17) at 4. The ALJ found that Plaintiff suffered from severe rheumatoid arthritis and severe osteoarthritis but concluded Plaintiff was not disabled during the relevant period because he found that she could perform her past work. *AR* at 128. In formulating the RFC, the ALJ discounted the opinion of Plaintiff's treating rheumatologist – Eleanor Anderson-Williams, M.D. – finding that Plaintiff's reported activities, physical examinations, and work activity after filing her claim for disability benefits suggested that the hand limitations assessed were overly restrictive. *Id*. Ultimately, the ALJ found that Plaintiff could perform sedentary work with some modifications, but she could "frequently finger or handle," and thus, could perform her past work as a collection clerk as generally performed. *Id*. at 125, 128. Accordingly, the following is a summary of the evidence that is relevant to Plaintiff's rheumatoid arthritis of the hands and wrists and its associated limitations.

*Medical Evidence*

On May 8, 2015, Plaintiff saw Dr. Anderson-Williams for increased arthritis symptoms and medication management. *Id*. at 1432-33, 1439. Particularly, Plaintiff's left wrist was painful, and she was unable to make a closed fist. *Id*. at 1433. The next month, Plaintiff presented to Paul

United States District Court
Northern District of California

1  Jean Sobel, M.D., her primary care provider, with intense, sharp pain in the left hand for four days

2  with difficulty flexing her fingers and tingling sensations. *Id*. at 1458. Plaintiff did not find relief

3  from her symptoms with pain medications or a wrist splint. *Id*. Plaintiff explained that she had

4  previously experienced these symptoms on both the left hand and right upper arm. *Id*. The

5  physical exam revealed Plaintiff had decreased grip strength of the left hand and a positive Tinel's

6  test of the wrist. *Id*. At the end of June of 2015, Plaintiff underwent an MRI of her left hand, and,

7  at the exam, she had swelling and pain at the carpal metacarpal region extending to the

8  metacarpophalangeal ("MCP") joints.[2] *Id*. at 1487-88.

9      On July 2, 2015, Plaintiff had an appointment with Jun Yamanokuchi Matsui, M.D., an

10  orthopedic hand surgeon, for evaluation of her left-hand pain for weakness, numbness, tingling

11  and possible surgical intervention. *Id*. at 1497. Plaintiff stated that she had terrible pain in her left

12  hand and a burning sensation that had been worsening for two months. *Id*. at 1498. Plaintiff

13  explained that she had two sudden onsets of pain, which she referred to as attacks, in the past two

14  months. *Id*. Dr. Matsui noted that the MRI of her left hand showed a possible ulnar artery

15  aneurysm, and Plaintiff reported that she had been diagnosed with rheumatoid arthritis and carpal

16  tunnel syndrome. *Id*. Plaintiff added that her medication did not improve her pain and that her

17  hand was hurting so much that she may not be able to fully participate in her physical exam that

18  day. *Id*. The physical exam revealed positive Tinel's test of the wrist over the median nerve,

19  positive Phalen test for the index finger, positive Durkan nerve compression test for the index,

20  middle, and ring fingers, ulnar nerve subluxation, and Tinel Guyon's canal. *Id*. at 1501. Plaintiff

21  was unable to open and close her fist to adequately perform an Allen test, and her grip strength of

22  the left was 20, 22 pounds and on the right 30, 36 pounds. *Id*. Dr. Matsui diagnosed Plaintiff with

23  left Guyon's canal syndrome, left carpal tunnel syndrome, and left-hand pain, and ordered a nerve

24  study and an angiogram of the left hand to further evaluate Plaintiff's symptoms. *Id*. at 1502,

25

26  [2] The MRI revealed: 4.5 mm dorsal volar by 5.9 mm transverse by 7.4 mm proximal distal T2 hyperintense,
heterogeneously enhancing lesion within the volar soft tissues just distal to the Guyon's canal, favoring

27  ulnar aneurysm/pseudoaneurysm; 5 mm dorsal volar by 1.3 cm transverse by 1.5 cm proximal distal
ganglion cysts along the dorsal radial soft tissues; 8 mm curvilinear T2 hyperintensity in the palmer soft

28  tissues along the flexor tendon apparatus of the third metacarpal at the MCP joint; and focal marrow edema
pattern within the radial margin of the lunate. *Id*. at 1488.

1509. Dr. Matsui discussed the risks, benefits, and alternatives of undergoing carpal tunnel release and Gunyon's release surgeries with Plaintiff and instructed her to return for a follow-up visit once the nerve study was completed. *Id*. at 1503.

On July 8, 2015, Plaintiff had a nerve study, and the results were normal. *Id*. at 1518-20. Thereafter, Dr. Sobel called and spoke to Plaintiff and she reported having right hand pain and was unable to grasp due to pain, stiffness, and weakness. *Id*. at 1524. Dr. Sobel told Plaintiff that he did not have a good explanation for her symptoms and that she should follow up with Drs. Anderson-Williams and Matsui. *Id*. Plaintiff expressed frustration at the lack of diagnosis, and Dr. Sobel ordered an MRI of the neck and x-ray of the elbow to determine the source of Plaintiff's pain. *Id*. at 1525. The MRI of Plaintiff's neck revealed degenerative disc disease, and the elbow x-ray was negative. *Id*. at 1533, 1536. Additionally, on July 20, 2020, Plaintiff underwent an MRI of her right hand that revealed: a 3 mm palmar dorsal by 10 mm transverse by 8 mm proximal distal lobulated collection along the ulnar aspect of the fourth extensor apparatus at the level of the MCP joint, compatible with a ganglion cyst; small pisiform triquetral and first carpal-metacarpal joint effusion; and subcortical cyst formation within the lunate and third metacarpal head. *Id*. at 1557.

A few days later, Plaintiff had an appointment with Michael Peterson, M.D., a physician who worked with Dr. Matsui, because she was experiencing a great deal of pain. *Id*. at 2584. Dr. Peterson noted that Plaintiff was "incredibly angry" because she wanted to know what could be done for her bilateral hand symptoms and "attacks of shocking pain three times a month lasting for days," and he did not have an answer. *Id*. He explained that Plaintiff's MRI of the left hand did not show carpal tunnel syndrome, but it did reveal that she had a possible ulnar artery aneurysm. *Id*. He recommended that Plaintiff get an angiogram to better understand her symptoms and evaluate whether surgery would relieve her symptoms. *Id*.

On July 29, 2015, Dr. Matsui held a phone appointment with Plaintiff to review the exams, including a new angiogram of the left hand and wrist. *Id*. at 2593, 2598. For the nerve study, Dr. Matsui explained that the results were negative, meaning that there was no nerve compression and no surgery for the nerve would improve her symptoms. *Id*. As for the MRI of the right hand, Dr. Matsui noted abnormalities consistent with rheumatoid arthritis but would not be the root of her

United States District Court
Northern District of California

1    pain attacks and surgery was not warranted for those abnormalities. *Id*. at 2598. Dr. Matsui

2    explained that the neck MRI revealed some nerve impingement that could cause some of the

3    sensations in her hands, and the CT angiogram revealed aneurysm of the ulnar artery which could

4    explain her symptoms despite the negative nerve study. *Id*. at 2599.

5           In August of 2015, Plaintiff presented to Dr. Anderson-Williams with episodic hand

6    swelling. *Id*. at 2645. Plaintiff was once again unable to make a fist with either hand. *Id*. at 2646.

7    On September 15, 2015, Plaintiff underwent another left-hand angiogram that revealed no

8    evidence of an ulnar artery aneurism but possible venous aneurysm and a mild irregularity of the

9    upper arm possiby consistent with vasculitis. *Id*. at 1888-89. Plaintiff followed up with Dr.

10   Anderson-Williams to review the diagnostic studies, and Dr. Anderson-Williams noted that

11   Plaintiff may have vasculitis but there was no involvement of other vessels; however, the

12   diagnostic studies revealed a corkscrew pattern, which could likely be Buerger's disease. *Id*.

13   Plaintiff had experienced some relief with Prednisone, but Plaintiff was still unable to make a

14   closed fist. *Id*. at 2769-70.

15          In November of 2015, H. Samplay, M.D., a state agency consultant, conducted an initial

16   disability determination, and, based on Plaintiff's medical records from 2015, Dr. Samplay

17   determined that Plaintiff had a light RFC. *Id*. at 723. Dr. Samplay also opined that Plaintiff's

18   handling limitation was "frequent" for the left hand due to decreased grip strength and possible

19   ulnar aneurysm. *Id*. at 727. In July of 2016, S. M. Niknia, M.D., another state agency consultant,

20   conducted a reconsideration of the initial disability determination by Dr. Samplay. *Id*. at 755. Dr.

21   Niknia reviewed some additional records from 2015, including an angiogram, and noted that a

22   possible diagnosis of Buerger's disease was asserted, but no other medical records discussed the

23   diagnosis. *Id*. To obtain a current functional assessment, the administration arranged two

24   consultative exams, but Plaintiff failed to attend. *Id*. Dr. Niknia determined that there was

25   insufficient medical evidence to opine about the functional limitations of Plaintiff's hands. *Id*.

26          In September of 2016, Plaintiff had a visit with Dr. Sobel in which Plaintiff had swelling in

27   both hands and slight swelling of the right wrist with tenderness. *Id*. at 2124. The following

28   month, Plaintiff had a follow-up visit with Dr. Anderson-Williams for persistent hand symptoms

United States District Court
Northern District of California

including numbness, stiffness, swelling, and pain. *Id*. at 3648, 3656-57. Plaintiff stated that she no longer worked for Stanford Health Center because of her hand and leg symptoms. *Id*. at 3648. Upon physical exam, Plaintiff was unable to make a fist. *Id*. at 3658. Plaintiff explained that she could not perform her usual work activities without modification, but she needed to work because she had bills to pay. *Id*. at 3660. Plaintiff's hand and wrist symptoms remained unchanged into 2017. *Id*. at 3593. In March, Plaintiff saw Dr. Anderson-Williams and the physical exam revealed tenderness, mild metacarpal synovitis, ulnar deviation or subluxation of both hands, tenderness or synovitis with decreased wrist flexion and extension of both hands. *Id*. at 3198.

On October 10, 2017, Dr. Anderson-Williams completed a medical questionnaire in which she opined that Plaintiff could not perform more than sedentary work due to her rheumatoid arthritis. *Id*. at 4339. She noted that her findings were based on Plaintiff's synovitis of the wrists, hands, and elbows, abnormal MRI findings, and elevated markers of inflammation. *Id*. Dr. Anderson-Williams opined that Plaintiff could reach, grasp, handle, feel, and perform fine finger manipulation for twenty-five percent of an eight-hour workday, but no more than sixty minutes at a time. *Id*. at 4340.

*Function Report*

Plaintiff reported that she has rheumatoid arthritis and her body aches all over, but her knees, hands, and neck were most severe. *Id*. at 963. At times, she could not use her hands, and air conditioning at cool temperatures makes her arthritis even worse. *Id*. Plaintiff stated that she was diagnosed with an artery aneurysm in her left hand. *Id*. She explained that most days she spent her time going to doctor's appointments and other days she cannot move due to her arthritis. *Id*. at 964. Before her arthritis, she would exercise and cook every day, but now she cannot even walk some days. *Id*. When her symptoms flared up, she could not lift her arms to get dressed or care for her hair, and she struggled to feed herself because her hands ache. *Id*. Plaintiff also had difficulty standing and sitting which interfered with her ability to bathe and use the toilet. *Id*. Plaintiff explained that meal preparation on most occasions consisted of microwaving frozen dinners and soups, but she tried to cook a meal once or twice a week. *Id*. at 965. As for household duties, Plaintiff tried to dust her home, but she would get tired and needed to take breaks. *Id*. She stated

that she would leave the house one to three times per week depending on her condition, and she tends to do online shopping rather than in-store shopping which she does once or twice a week. *Id*. at 966. Some days the only activity Plaintiff could do was watch TV. *Id*. at 967. She tried to make it to church on Sundays when she could, but some days it was hard for her to walk or use her hands. *Id*. at 967-68. Plaintiff stated that her symptoms interfered with her ability to sit, walk, lift, reach, and use her hands at all, and that she used a splint when her hand symptoms flared up. *Id*. at 968.

*Hearing Testimony*

Plaintiff testified that she had worked as a collections clerk for ten years, but she had to leave her job due to her impairments. *Id*. at 141-42. About one year later, in 2016, Plaintiff joined a staffing agency to obtain temporary jobs because she needed to pay her bills until her disability application could be heard. *Id*. at 141. For example, Plaintiff worked as a medical billing and coding specialist at Stanford Health Center where she assisted patients over the phone sorting out discrepancies in their medical bills. *Id*. at 143. Plaintiff explained that she had to seek employment because she was single and had rent and other obligations. *Id*. at 144.

She held other temporary, clerical jobs here and there in 2016 and 2017 to stay afloat, but she experienced problems due to her symptoms. *Id*. at 144-46. Plaintiff explained that her arthritis and carpal tunnel interfered with her performance. *Id*. at 148-49. At Stanford Health Center, she had to make at least forty-five client calls per day and had three to five minutes between calls to "enter a lot of information in the system very quickly." *Id*. Plaintiff stated that she was let go from that job because she was not able to perform the rigors of the job. *Id*. at 149. Plaintiff stated that she was fired not long after she had an arthritis "attack" in her ankles and had to leave work early and take the following day off to go see the doctor. *Id*. at 150. She explained that she cannot keep a job because one day she could work "8 hours and wake up the next day and not be able to go" because of her arthritis in her hands and feet. *Id*. at 154. She would be absent from work once a week or every other week because of her condition. *Id*. at 155-56. Plaintiff explained that she could use her hands for about fifteen minutes before she needs to take a break for five to fifteen minutes, and that her hand symptoms worsen if she uses them a lot during the day. *Id*. at 158.

1    Additionally, her hand symptoms have generally worsened over time regardless of activity. *Id*. at

2    158-59. Prior to her arthritis, Plaintiff was "very athletic" and she liked to work out and cook, but

3    she cannot do those things anymore. *Id*. at 162.

4        Once Plaintiff's testimony concluded, the ALJ posed hypotheticals to the vocational expert

5    ("VE") to determine Plaintiff's ability to work. *Id*. at 167-78. The VE classified Plaintiff's past

6    work as a banker, collection clerk, and medical coder or biller. *Id*. at 170. For hypotheticals where

7    the supposed individual had the ability to frequently handle and finger, the VE testified that

8    Plaintiff's past work as generally performed would be available. *Id*. at 171-75. Once the

9    hypothetical changed to a supposed individual who was limited to occasional handle and finger

10   abilities of the left hand with no restrictions on the right hand, Plaintiff's past work was not

11   available. *Id*. at 176-77. The VE added that work as a phone clerk would still be available, but he

12   also stated that no jobs would be available because most unskilled jobs would require use of both

13   hands most of the time. *Id*. at 176-77. The VE concluded by stating that Plaintiff's past work, and

14   other proposed work, skilled and unskilled, required frequent handling and fingering so a

15   restriction to occasional handling and fingering would eliminate the proposed jobs. *Id*. at 177.

16           **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

17       A person filing a claim for social security disability benefits ("the claimant") must show

18   that she has the "inability to do any substantial gainful activity by reason of any medically

19   determinable physical or mental impairment" which has lasted or is expected to last for twelve or

20   more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[3] The ALJ must consider all evidence in

21   the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

22   step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

23   416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

24   the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

25       Here, the ALJ set forth the applicable law under the required five-step sequential

26

27   ───────────────
     [3] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II)
28   are virtually identical though found in different sections of the CFR. For the sake of convenience, the court
     will generally cite to the SSI regulations herein unless noted otherwise.

1    evaluation process. *AR* at 120-28. At Step One, the claimant bears the burden of showing that she

2    has not been engaged in "substantial gainful activity" since the alleged date the claimant became

3    disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be

4    substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that

5    Plaintiff engaged in substantial gainful activity during the following periods: April 2016 through

6    September 2016 and June 2017 through September 2017. *AR* at 123-24. The ALJ added that,

7    because he found her not disabled for those periods, the work activity was not privileged under the

8    "trial work period." *Id*. at 124. At Step Two, the claimant bears the burden of showing that she has

9    a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii),

10   (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight

11   abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'"

12   *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The

13   ALJ found that Plaintiff suffered from severe rheumatoid arthritis and severe osteoarthritis. *AR* at

14   124.

15          At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

16   appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

17   burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant

18   is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

19   the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

20   *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

21   combination of impairments that met or medically equaled the severity of any of the listed

22   impairments. *AR* at 125. Next, the ALJ determined that Plaintiff retained the RFC to perform

23   sedentary work with a series of limitations including that Plaintiff can lift and carry 20 pounds

24   occasionally, that she can lift 10 pounds frequently, sit up to 6 hours in an 8-hour workday with

25   normal breaks, and she can stand and/or walk 2 hours in an 8-hour workday with normal breaks.

26   *Id*. Additionally, the ALJ found that Plaintiff can frequently operate foot controls with her right

27   lower extremity and frequently finger or handle, but that Plaintiff cannot tolerate concentrated

28   exposure to extreme cold. *Id*.

United States District Court
Northern District of California

1     At Step Four, the ALJ determined that Plaintiff is able to perform her past relevant work as

2   generally performed. *Id*. at 128. Accordingly, the ALJ concluded that Plaintiff had not been under

3   a disability, as defined in the Social Security Act, from May 1, 2015 (the amended alleged onset

4   date), through the date of the issuance of the ALJ's decision, May 18, 2018. *Id*.

5                                        **DISCUSSION**

6     Plaintiff argues that the ALJ made two errors at the RFC stage: 1) the ALJ improperly

7   rejected the medical opinion of a treating provider, and 2) failed to address an apparent conflict

8   between occupational data. *See* Pl.'s Mot. (dkt. 21). First, Plaintiff asserts that the ALJ improperly

9   rejected Dr. Anderson-Williams's opinion that Plaintiff cannot use her hands for more than

10  twenty-five percent of an eight-hour workday.[4] Pl.'s Mot. (dkt. 21) at 7-17. Specifically, Plaintiff

11  argues that the ALJ's reasons (Plaintiff's physical examinations, reported activities, and work

12  activity) for rejecting Dr. Anderson-Williams's opinion were not specific and legitimate. *Id*.

13  Contrary to the ALJ's opinion, the physical exams from 2015 and into 2017 consistently affirm

14  Plaintiff's rheumatoid arthritis in the hands and wrists with pain, tenderness, and swelling; and

15  thus, "are not inconsistent with a limitation to occasional hand use." *Id*. at 9-12. Plaintiff further

16  asserts that the July 2015 nerve conduction study that was normal is not inconsistent Dr.

17  Anderson-Williams's opinion because that study "rules out neurological causes of hand pain but

18  not rheumatological explanations." *Id*. at 10.

19    Likewise, Plaintiff argues that her reported activities of preparing microwave dinners,

20  performing limited household cleaning, and shopping once or twice a week are not inconsistent

21  with Dr. Anderson-Williams's opinion, and the regulations do not require her to be "utterly

22  incapacitated to be eligible for benefits." *Id*. at 12-13. Finally, Plaintiff asserts that her work

23  activities in 2016 and 2017 are not inconsistent with the hand limitations that Dr. Anderson-

24  Williams assessed because Plaintiff worked despite her condition to pay bills while waiting for her

25  social security application to be heard by an ALJ. *Id*. at 13-17. Plaintiff also argues that her work

26  _____

27  [4] The pertinent regulations define "occasional" as the ability to perform the activity for up to one-third of an
    eight-hour workday, "frequently" means one to two-thirds of an eight-hour workday, and "constantly"

28  means two-thirds or more of an eight-hour workday. Def.'s Mot. (dkt. 22) at 6 (citing Programs Operations
    Manual System ("POMS") DI 25001.001(A)(34)).

United States District Court
Northern District of California

1    activity represented a "trial work period." *Id*. at 14 (citing 20 C.F.R. § 220.170). Plaintiff adds that

2    the ALJ admitted additional work history evidence after the hearing without notifying Plaintiff or

3    Plaintiff's counsel, and thus, Plaintiff was denied due process because she was not given an

4    opportunity to respond. *Id*. at 16.

5         In response, Defendant asserts that the ALJ properly rejected the hand limitations assessed

6    by Dr. Anderson-Williams because she submitted a pre-printed questionnaire that stated that

7    "Plaintiff could reach/grasp for 25 percent of the workday, handle for 25 percent of the workday,

8    and finger (fine manipulation) for 25 percent of the workday . . . ." Def.'s Mot. (dkt. 22) at 6.

9    Defendant then confusingly interprets Dr. Anderson-Williams's opinion to mean that Plaintiff can

10   "perform these manipulative activities for a total of 75 percent of the workday," apparently adding

11   up each of the three categories of activities. *Id*. Defendant also argues that the ALJ properly

12   balanced Dr. Anderson-Williams's restrictive hand limitations against Dr. Samplay's opinion that

13   Plaintiff could handle with her left hand for "67 percent of the workday and perform unlimited

14   fingering,"[5] and the ALJ properly assessed the RFC because he did not accept either doctors'

15   opinion in their entirety, and instead, developed a RFC somewhere in the middle of the two

16   opinions. *Id*. at 7. Defendant adds that Plaintiff's attempt to discredit Dr. Samplay's opinion as a

17   non-examining consultant is improper because the agency arranged for two consultative

18   examinations, but Plaintiff failed to appear. *Id*. at 8. Therefore, Plaintiff "should not be permitted

19   to now benefit from her failure to appear . . . by giving preference to her physician's *unsupported*

20   and contradicted opinion." *Id*. (emphasis added). Defendant then implies that Dr. Samplay's

21   opinion should be given more weight than Dr. Anderson-Williams's opinion because he had the

22   opportunity to review records that Dr. Anderson-Williams did not, and that, while Dr. Anderson-

23   Williams may have been a specialist in the field of rheumatology, Dr. Samplay had more

24   experience (i.e., he was specialized) in evaluating disability claims. *Id*.

25        Next, Defendant repeats the ALJ's reasons for rejecting Dr. Anderson-Williams's opinion,

26   and points to the normal nerve study and some portions of the physical exams for the proposition

27

28   _____

     [5] Dr. Samplay did not provide a percentage or state that Plaintiff had the ability to perform unlimited finger
     manipulations. Rather, Dr. Samplay stated that Plaintiff could "frequently" handle and finger. *Id*. at 727.

United States District Court
Northern District of California

that Plaintiff retained "a significant level of residual functioning." *Id.* at 7. As for Plaintiff's temporary work in 2016 and 2017, Defendant asserts that work provided further justification for the ALJ's rejection of Dr. Anderson-Williams's opinion because those jobs required a "significant level of manipulative capabilities . . ." *Id.* at 8. Defendant adds that Plaintiff's argument regarding the "trial work period" issue is related to eligibility for disability benefits despite her substantial gainful activities, and not her RFC. *Id.* at 9-10. Finally, as for Plaintiff's reported activities, Defendant argues that the ALJ reasonably found that those activities, although stated in ambiguous terms, "demonstrated significant use of her hands through the day." *Id.* at 10.

The court begins by noting that medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough

12

1   summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof,

2   and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v.*

3   *Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician

4   cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either

5   an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (9th Cir. 1995); *see also*

6   *Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006);

7   *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813,

8   818 n.7 (9th Cir. 1993). It should also be noted that greater weight is due to the "opinion of a

9   specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(5);

10   *Revels*, 874 F.3d at 654. In situations where a Plaintiff's condition progressively deteriorates, the

11   most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th

12   Cir. 1986).

13          Assuming Dr. Anderson-Williams's opinion was contradicted by Dr. Samplay's opinion,

14   the ALJ was required to provide specific and legitimate reasons for rejecting her assessment of

15   Plaintiff's hand limitations. The ALJ failed to meet this standard. Before examining the ALJ's

16   offered reasons, the court begins by noting that Dr. Samplay rendered his opinion during the initial

17   disability determination in 2015, which was based on his review of medical records from that year.

18   *Id*. at 724-25, 727. Later, in 2016, with the benefit of additional medical records, state agency

19   consultant Dr. Niknia found that there was insufficient evidence to render a functional assessment,

20   noting that Plaintiff failed to attend two scheduled consultative evaluations. *Id*. at 755. Dr.

21   Anderson-Williams, a rheumatologist and Plaintiff's treating physician of two years, rendered her

22   opinion as to Plaintiff's hand limitations in October of 2017. *Id*. at 4339-40. The court proceeds to

23   evaluate the ALJ's decision in light of these facts and the deference due to opinions of treating

24   physicians, the opinions of specialists on matters within their field, and opinions rendered later in

25   time for progressive illnesses.

26          The ALJ's first reason for rejecting Dr. Anderson-Williams's opinion is that Plaintiff's

27   physical exams suggest greater functional abilities. On the contrary, physical examinations

28   consistently showed that Plaintiff had tenderness and swelling of the hands and wrists, that she

United States District Court
Northern District of California

13

1   was unable to make a fist on numerous occasions, that she had decreased grip strength, a positive

2   Tinel's test, a positive Phalen test, and a positive Durkan test. *Id*. at 1458, 1501, 2124, 2645, 2769-

3   70, 3648, 3656-58, 3593, 3198. While a nerve study test was negative (i.e., it failed to show nerve

4   compression) and ruled out one possible diagnosis, there were MRI scans and angiograms that

5   showed abnormalities that raised questions for Plaintiff's treating doctors – Dr. Anderson-

6   Williams, Dr. Matsui, Dr. Peterson, and Dr. Sobel – on how to best address Plaintiff's hand

7   symptoms. In fact, Dr. Matsui opined that the abnormalities detected in the July 2015 angiogram

8   could explain why Plaintiff's symptoms persisted despite a negative result on the nerve study. *Id*.

9   at 2598-99. Likewise, Dr. Anderson-Williams changed her earlier diagnosis of an artery aneurysm

10  to venous aneurysm and vasculitis based on an angiogram taking in September of 2016. *Id*. at

11  1888-89; 2769. Neither Dr. Matsui nor Dr. Anderson-Williams determined that Plaintiff had

12  recovered or noted any improvement of her hand symptoms. Rather, they were continually trying

13  to find the appropriate diagnosis and treatment while Plaintiff continued to suffer.

14      Likewise, Plaintiff's reported activities do not serve to undermine Dr. Anderson-

15  Williams's assessed limitations. The ALJ's statements on this point are contradictory. While

16  discussing Dr. Samplay's opinion, the ALJ stated that "additional manipulative limitations" were

17  supported by the medical record (e.g., Plaintiff's inability to make a fist and tenderness and

18  swelling of the hands and wrists), but then goes on to state that "[t]he claimant's reported activities

19  (meal preparation, household cleaning, washing laundry, and shopping) . . . suggest that greater

20  functional limitation is not warranted." *Id*. at 127. Dr. Samplay opined that Plaintiff could

21  frequently handle with her left hand (*id*. at 727), and the RFC provided that Plaintiff could

22  frequently finger or handle (*id*. at 125); thus, the ALJ did not assess any "additional manipulative

23  limitations." In any event, a closer reading of the record reveals that these "reported activities"

24  were vague and the activities alleged with some detail actually describe limited functionality.

25  Plaintiff stated that she used to exercise and cook daily, but now, she has days where she cannot

26  move due to her arthritis. *Id*. at 964. As for meal preparation, she mostly microwaves frozen

27  dinners or soups, but she tries to prepare a meal once or twice a week. *Id*. at 964-65. For personal

28  care, Plaintiff noted that she cannot lift her arms some days to put on clothes or care for her hair,

and that feeding herself can been a challenge because her hands ache. *Id*. at 964. The only housework she mentions is dusting, and she added that she gets tired and needs to take breaks. *Id*. at 965. The ALJ also cited to Plaintiff's ability to do laundry (*id*. at 127); the court searched the record to find such a statement, but none appears. Finally, Plaintiff stated that she shopped once or twice a week for about one hour each time and that she does most of her shopping online. *Id*. at 966. Other reported activities that the ALJ did not include are watching TV which is the only activity Plaintiff can do some days, and attending church if her body allows her to move. *Id*. at 967. These activities do not tend to show that Plaintiff has the ability to use her hands for longer than her treating provider – Dr. Anderson-Williams – opined.

As for her work activities, the ALJ found that Plaintiff engaged in substantial gainful activity from April 2016 to September 2016 and from June 2017 to September of 2017. *Id*. at 123. However, in the ALJ's own words, Plaintiff "did not take on an additional assignment after June of 2017 due to her health condition." *Id*. at 123-24. Additionally, Plaintiff testified that she could not hold a job (*id*. at 154), and she was "let go" from Stanford Health Care because her performance did not meet the rigors of the job. *Id*. at 149. Moreover, the jobs she held in 2016 and 2017 were temporary jobs that she needed in order to support herself and pay bills while her disability application was pending. *Id*. at 143-44. Plaintiff stated that she worked through her symptoms which had been worsening (*id*. at 141, 159), and she missed days due to her condition (*id*. at 155), and she needed to take breaks every fifteen minutes due to her hand symptoms (*id*. at 158). Together the facts show that Plaintiff worked temporary jobs here and there while suffering from worsening arthritis because she had no one else to rely on for support. Attempts to stave off financial insecurity do not take away from the fact that Plaintiff suffers from rheumatoid arthritis that her treating physician of two years believes renders Plaintiff able to perform hand manipulations for twenty-five percent of an eight-hour workday.

The RFC, as formulated by the ALJ, depended entirely on the opinion of a non-examining consultant – Dr. Samplay – from 2015. He did not split the difference between Dr. Samplay's opinion and Dr. Anderson-Williams's opinion as Defendant suggests. Additionally, had the ALJ credited the hand limitations assessed by Dr. Anderson-Williams, Plaintiff's treating physician,

15

United States District Court
Northern District of California

1  the ALJ would have been required to find Plaintiff disabled based on the above-recited portion of

2  the VE's testimony. As stated above, the reasons cited for rejecting Dr. Anderson-Williams's

3  opinion are not legally sufficient. The record makes clear that Plaintiff suffered from rheumatoid

4  arthritis that impacted her ability to dress herself, care for her hair, cook, and hold even temporary

5  jobs.

6          While the ALJ felt comfortable rejecting Dr. Niknia's opinion that the record was

7  insufficient to render a functional assessment, this court does not. In the ALJ's own words, "an

8  internal medicine [evaluation] would be helpful." *Id*. at 127.[6] The ALJ has not only the power, but

9  the duty, to "conduct an appropriate inquiry" if the evidence is ambiguous or inadequate to permit

10 a proper evaluation of a claimant's impairments. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir.

11 1996). If evidence from a medical source is inadequate to determine if the claimant is disabled, an

12 ALJ may be required to re-contact the medical source, including a treating physician, to determine

13 if additional needed information is readily available. *See* 20 C.F.R. §§ 404.1520b(c)(1),

14 416.920b(c)(1); *see also Webb*, 433 F.3d at 687 ("[t]he ALJ's duty to supplement a claimant's

15 record is triggered by ambiguous evidence [or] the ALJ's own finding that the record is

16 inadequate"). The responsibility to fulfill this duty belongs entirely to the ALJ; it is not part of the

17 claimant's burden. *See e.g., White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001); *see also*

18 *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Here, the ALJ failed to discharged the

19 "duty to investigate the facts and develop the arguments both for and against granting benefits."

20 *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). In light of the above, because the court finds that

21 further administrative proceedings would serve a useful purpose, the court orders this matter be

22 remanded for further development of the record, particularly to evaluate Plaintiff's manipulative

23 limitations and determine the appropriate RFC based on the record.

24          Turning to Plaintiff's second assertion of error, she argues that the ALJ's determination

25 that she could perform her past work as generally performed was not supported by substantial

26

27 _____

   [6] While Plaintiff failed to attend two consultative examinations, the record is unclear as to the reason; the
28 record, however, is clear about the possibility that Plaintiff's symptoms may have been a contributing
   factor – in any event, the record could benefit from further development in this regard.

evidence because there is a discrepancy between government data about the relevant occupational requirements. Plaintiff argues that the ALJ was required to resolve the difference between the sitting requirements in the Dictionary of Occupational Titles ("DOT") and the Occupational Requirements Survey ("ORS") generated by the Department of Labor's Bureau of Labor Statistics. Pl.'s Mot. (dkt. 21) at 5-7. In sum, Plaintiff's argument is that the ORS establishes that Plaintiff's past work, as generally performed, requires more than six hours of sitting in an eight-hour workday. *Id*. at 6. Plaintiff asserts that "no reasonable person would accept the [VE's] testimony" in light of the conflict between the DOT and ORS data, and Plaintiff adds that she preserved this issue for appeal by presenting it to the Appeals Council even though neither she nor her counsel raised it at the hearing. *Id*. Finally, Plaintiff argues that the ALJ did not make an alternative work finding, and if Plaintiff cannot perform her past work, then she meets the legal test for disability as of age fifty. *Id*. at 7.

Defendant counters that Plaintiff waived any challenge to the VE's testimony about the sitting requirements because she did not raise them during the hearing. *Id*. at 4. Even if the challenge was preserved, Defendant argues that the ALJ and VE did not rely on the ORS, and, instead, they relied on the DOT. *Id*. at 5. Moreover, Defendant argues that the ALJ was not required to resolve any alleged conflicts between the DOT and ORS, and cases in the Ninth Circuit have rejected similar arguments. *Id*. at 6.

A federal court's review of social security determinations is limited, and a reviewing court will disturb "the Commissioner's decision to deny benefits 'only if it is not supported by substantial evidence or is based on legal error.'" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.1995)); *see also Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir.2002). Additionally, "'claimants who are represented by counsel must raise all issues and evidence at their administrative hearings to preserve them on appeal.'" *Markell v. Berryhill*, No. 17-cv-00792-MEJ, 2017 WL 6316825, at *8 (N.D. Cal. Dec. 11, 2017) (quoting *Lamear v. Berryhill*, 865 F.3d 1201, 1206 (9th Cir. 2017)) (internal quotation marks omitted). However, pure questions of law may be raised for the first time on appeal so long as the Commissioner has an opportunity to respond. *See Silveira v. Apfel*, 204

17

1    F.3d 1257, 1260 n.8 (9th Cir. 2000).

2         The Commission will generally take administrative notice of "reliable job information

3    available from various governmental and other publications," and lists examples such as the DOT

4    and Occupational Outlook Handbook ("OOH") published by the Bureau of Labor Statistics. 20

5    C.F.R. § 416.966. Social Security Ruling 00-04P provides that an ALJ must resolve any conflicts

6    between VE testimony and information in the DOT. *See* SSR 00-04P, 2000 WL 1898704. Courts

7    in the Ninth Circuit have not extended the ALJ's duty to resolve conflicts between VE testimony

8    and DOT to other sources of occupational data, including the OOH. *See Gonzalez v. Berryhill*, No.

9    17-cv-5402-E, 2018 WL 456130, at *3 (C.D. Cal. Jan. 17, 2018) ("[A]n ALJ is under no

10   obligation to consult the OOH or to attempt to reconcile conflicts between the OOH and

11   vocational expert testimony.") (citing *Shaibi v. Berryhill*, 870 F.3d 874, 882 (9th Cir. 2017)); *see*

12   *also Markell*, 2017 WL 6316825, at *11 (finding that SSR 00-04P's requirement that the ALJ

13   must resolve discrepancies between a VE's testimony and the DOT does not extend to

14   discrepancies between VE testimony and the OOH, and that the OOH is not controlling and not

15   required to be consulted).

16        Here, Plaintiff asks this court to extend the ALJ's duty to resolve discrepancies under SSR

17   00-04P to discrepancies between a VE's testimony and the ORS. This the court will not do. Other

18   courts in the Ninth Circuit have declined to entertain similar arguments for the OOH, a source that

19   is identified by name in the social security regulations. The ORS, unlike the OOH, is not named in

20   the regulations, and while it is from a governmental publication, the court is not inclined to create

21   a duty that an ALJ must *sua sponte* identify any relevant, permissible sources of employment data,

22   take administrative notice of such data, and determine and resolve any discrepancies between

23   those sources, the VE testimony, and the DOT. Thus, regardless of the issue of waiver, the court

24   finds that the ALJ did not commit error with regard to the alleged discrepancies between the ORS,

25   DOT, and VE's testimony.

26   //

27   //

28   //

United States District Court
Northern District of California

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (dkt. 21) is

**GRANTED**, and Defendant's motion for summary judgment (dkt. 22) is **DENIED**. The case is

remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 16, 2020

ROBERT M. ILLMAN
United States Magistrate Judge